UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ROY ROGERS,                              )
                                         )
      Plaintiff,                         )
                                         )
          v.                             )     Case Number 1:12-cv-976 (AJT)
                                         )
CHRISTOPHER STEM,                        )
                                         )
      Defendant.                         )
_____)

## MEMORANDUM OPINION

On September 14, 2011, plaintiff Roy Rogers ("the plaintiff" or "Rogers") was arrested for (1) conspiracy to sell, give, distribute, or possess with the intent to sell, give or distribute, synthetic cannabinoids in violation of Va. Code §§18.2-256 and 18.2-248.1:1(2011); and (2) possession with the intent to sell, give, or distribute synthetic cannabinoids in violation of §18.2-248.1:1(C). Stipulation of Uncontested Facts ¶¶ 3-4, Doc. No. 53 [hereinafter "Stip. Facts"]. On February 17, 2012, Rogers was acquitted on both charges at the preliminary hearing stage. *Id.* at ¶ 6. On August 30, 2012, the plaintiff filed this action under 42 U.S.C. § 1983, claiming that he was arrested in violation of the Fourth and Fourteenth Amendments to the United States Constitution because his arrest warrants were issued without probable cause. Compl., Doc. No. 1. Defendant Christopher Stem ("the defendant" or "Stem") is an investigator with the Hanover County Sherriff's Office ("HCSO"), who applied for and obtained the warrants for Rogers' arrest. *Id.*

Stem has filed a Motion for Summary Judgment (the "Motion") [Doc. No. 47] on the grounds that, as a matter of law, he had probable cause to obtain the arrest warrants and that in any event, his conduct is not actionable under the doctrine of qualified

immunity. The Court held a hearing on the Motion on May 10, 2013, following which it took the matter under advisement. For the reasons stated below, the defendant has not established as a matter of law, based on undisputed facts, that he had probable cause to believe the plaintiff committed the charged offenses or that he is entitled to qualified immunity for his conduct. The Motion will therefore be DENIED.

**Facts and Procedural History**[1]

The Custom Blends Tobacco Store ("Custom Blends" or "the Store"), as described by Rogers, is a "high end" tobacco shop located in Hanover, Virginia.[2] Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. 2, Doc. No. 70 [hereinafter "Opp'n MSJ"]. In

---

[1] As required by Local Rule 56(B), Stem has filed a statement of material facts as to which he contends there is no dispute. Rogers has not filed, as required, a specifically captioned section listing all material facts as to which he contends there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute. Rather, he claims that Stem's proffered facts are "immaterial" to the legal issues presented by Stem's Motion and has filed his own statement of undisputed facts. *See* Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. 2, n.2, Doc. No. 70 [hereinafter "Opp'n MSJ"]. Given Rogers' failure to respond as required to Stem's Statement of Undisputed Facts, the Court will, pursuant to Local Rule 56(B), accept as undisputed the facts (as opposed to the inferences) in Stem's statement of material facts. The Court will also consider the facts recited in Rogers' statement of undisputed facts, listed in his Opp'n MSJ, for the purpose of background and also viewing, as required, the undisputed facts in a light most favorable to Rogers for the purposes of Stem's Motion.

[2] According to Rogers, Custom Blends "specializes in the sale of farm-fresh chemical-free tobacco for self-rolled cigarettes." Opp'n MSJ 3, ¶ 3. Its tobacco is available in twenty-six varieties, all of which are "privately compounded by the manufacturer for Custom Blends stores." *Id.* at ¶ 4. Advertising itself as an alternative to commercial cigarettes, Custom Blends offers its customers the opportunity to purchase loose tobacco from open bins, create their own mixtures, and roll their personal blend into cigarettes using rolling paper and machines available at the store. *Id.* at ¶¶ 5-6. Custom Blends also sells tobacco made specifically for use with hookahs, pipes, as well as chewing tobacco, in addition to a variety of tobacco related products and equipment (i.e., humidors, tobacco vaporizers, and tobacco rolling devices). *Id.* at ¶ 7. "The sale of tobacco products account for approximately 80% of the store's business." *Id.* at ¶ 8.

addition to its tobacco products, the Store sells "various incense products used for the purpose or neutralizing the smell of tobacco smoke." *Id.* at 4, ¶ 9. These products include "air freshener sprays, car vent deodorizers, incense candles, incense sticks, incense cones, and incense burners with aromatic oils, aromatic solids or herbal incense to be heated therein." *Id.* This case arises out of Custom Blends' sale of certain products marketed and sold as "herbal incense," particularly "Bayou Blaster USA."[3] *Id.* at Ex. 17.

Although herbal incense products are not ostensibly intended for human consumption, they had been identified by law enforcement as the source of powerful marijuana mimicking substances known as synthetic cannabinoids.[4] On March 23, 2011,

---

[3] According to Rogers, herbal incense is "one of several forms of incense to diffuse scent in an enclosed area, whether to mask smoking smells or for aesthetic, therapeutic or spiritual reasons." Opp'n MSJ 6, ¶ 20. It is "typically used by sprinkling a small amount on a smoldering charcoal briquet placed on an incense burner or other container. The herbs burn and let off their scent. The amount of incense used depends on how long the scent is to last, the size of the room, and how intense a fragrance is desired." *Id.* at 7, ¶ 22. Rogers notes that all herbal incense products sold at Custom Blends are sold in sealed foil packets that contain product name and labels "Not for Human Consumption" and "No Cannabinoids." *Id.* at 15, ¶ 46.

[4] On March 1, 2011, the Drug Enforcement Administration ("D.E.A.") passed its first regulation classifying certain synthetic cannabinoids (a.k.a. "synthetic marijuana" and "spice") as Schedule I substances, citing their emergence in the U.S. designer drug market and "a rapid and significant increase in abuse of these substances. . . ." U.S. D.E.A., Schedules of Controlled Substances: Temporary Placement of Five Synthetic Cannabinoids Into Schedule I, 76 Fed. Reg. 11075-01 (Mar. 1, 2011) (codified at 21 C.F.R. pt. 1308). By the time these substances were listed as controlled at the federal level, several states and the U.S. military had prohibitions on the possession or use of some or all synthetic cannabinoids, due to "the[ir] potential to be extremely harmful and, therefore, pose an imminent hazard to the public safety." *Id.* The D.E.A.'s regulation provided the following background:

> A "cannabinoid" is a class of chemical compounds in the marijuana plant that are structurally related. The cannabinoid [Delta]9-tetrahydrocannabinol (THC) is the primary psychoactive constituent of marijuana. "Synthetic cannabinoids" are a large family of chemically unrelated structures functionally (biologically) similar to THC, the active principle of marijuana.

the Virginia General Assembly enacted Va. Code §18.2-248.1:1 (the "Ban on

Synthetics"), which criminalized the possession, sale, distribution, and/or manufacture, or

possession with the intent to sell, give, or distribute, a "synthetic cannabinoid." §18.2-

248.1:1(B)-(C) & (E). Under the Ban on Synthetics, a substance qualified as a "synthetic

cannabinoid" in one of two ways: (1) it contained "any detectable amount" of one or

more of the ten compounds listed under §18.2-248.1:1(A)[5] (a "listed substance" or

"Section (A) substance"), or (2) it is a substance otherwise captured under §18.2-

248.1:1(F) (a "Section (F) substance"). Section (F), which in effect expands the types of

substances that are prohibited, but not specifically listed under Section (A), provides:

> Any drug not listed in this section or the Drug Control Act (§ 54.1-3400, et seq.),
> which is privately compounded, with the specific intent to circumvent the
> criminal penalties for synthetic cannabinoids, to emulate or simulate the effects of
> synthetic cannabinoids through chemical changes such as the addition, subtraction
> or rearranging of a radical or the addition, subtraction or rearranging of a
> substituent, shall be subject to the same criminal penalties as for synthetic
> cannabinoids.

Va. Code §18.2-248.1:1(F)(2011). In other words, Section (F) criminalizes substances

that are created (under certain conditions) to produce the same effects as known/listed

---

. . .

> [The listed synthetic cannabinoids] have been identified in related herbal incense
> products and plant food. These synthetic cannabinoids have purported
> psychotropic effects when smoked or ingested. These substances are typically
> found in powder form or are dissolved in appropriate solvents, such as acetone,
> before being sprayed on the plant material contained in the herbal incense
> products. The popularity of these THC-like synthetic cannabinoids has
> significantly increased throughout the United States, and they are being abused
> for their psychoactive properties as reported by law enforcement, the medical
> community, and through scientific literature.

[5] Since its initial passage, §18.2-248.1:1 has been amended several times to significantly
increase the number of substances banned under Section (A).

4

synthetic cannabinoids, but that are not identified under Section (A), and so would
otherwise be legal.

Aware that many local tobacco stores sold herbal incense products, three weeks
after the Ban on Synthetics was passed, HCSO deputies began visiting tobacco shops in
the county to inform them of the new legislation prohibiting synthetic cannabinoids. *Id.* at
¶ 5. On April 13, 2011, two members of the HCSO, Deputy Carrie L. Gray ("Dep.
Gray") and Investigator B ("Inv. B")[6] visited Custom Blends and spoke with the Store's
employee, Dawn Lindsay[7] ("Lindsay"). *Id.* at ¶ 6. During that visit, Dep. Gray asked
Lindsay whether Custom Blends had any "spice" in the store; in response, Lindsay
showed Dep. Gray a box full of products that the Store had just received from a
commercial wholesaler, stating that the products were all legal because they did not
contain any of the banned compounds. *Id.* When Inv. B arrived at Custom Blends,
Lindsay also gave him permission to search the store. *Id.* at 5, ¶ 8. During the search,
Inv. B discovered in the Store's back office an open sample packet (not for sale) of "K2,"
which Inv. B knew to contain an illegal, Section (A) substance. *Id.* at ¶¶ 9-10. Inv. B told
Lindsay that Custom Blends should not possess and/or sell "Spice or products that could
be confused with Spice because they were illegal." *Id.* at ¶ 11. Before leaving, the
officers confiscated for testing the K2 sample and the box of other herbal incense

---

[6] The Court will continue to use the same pseudonyms agreed to by the parties in order to
protect the identity of HCSO undercover officers.

[7] Lindsay was also arrested with Rogers and charged with violating Va. Code § 18.2-
248:1-1; like Rogers, the charges against Lindsay were dismissed at a preliminary
hearing. Compl. 5, ¶ 20. Lindsay was originally a plaintiff in this case, but voluntarily
dismissed her claim on January 15, 2013. *See* Stipulation of Dismissal, Doc. No. 21;
Order, Doc. No. 24.

products, and later submitted these to the Virginia Department of Forensic Science ("DFS") for testing. *Id.* at ¶ 12. DFS concluded that two of the confiscated products, one of which was the sample packet of K2, tested positive for Section (A) substances,[8] while the remaining products tested negative for any Section (A) substances. *Id.* at ¶ 13.

Following the April 13, 2011, visit, the HCSO launched an undercover investigation of Custom Blends, headed by Stem. MSJ 6, ¶¶ 17-18. Between June and September 2011, Stem and other undercover officers, posing as customers, visited Custom Blends on three occasions in an attempt to purchase spice, that is, products they knew contained a Section (A) substance. *Id.* at ¶¶ 19, 30, & 37. On each occasion, Stem or another undercover officer would request the purchase of "G.I. Jane," or another known, illegal spice product. *Id.* In each instance, Lindsay told the officers that what they had asked for was illegal and that the Store did not sell it. *Id.* Rogers was not in the Store during any of the three visits by law enforcement and never participated in the sale of any products to Stem or any other undercover officer. *Id.*

During his visits to Custom Blends on June 9 and September 1, 2011, Stem was shown, at his request, products locked inside a glass cabinet that he suspected to be spice (labeled "Kush," "Hayze Train Wreck," and "Bayou Blaster"). *Id.* at ¶¶ 19 & 37. While in the Store, Stem and the other undercover officers attempted to elicit information from Lindsay about potential illegal uses and/or ways of ingesting various herbal incense products. For example, during his visit on September 1, Stem discussed the purchase of a

---

[8] The other product that tested positive for a Section (A) substance was a sample packet of "Euphoria 5X," which Custom Blends also did not offer for sale. Joint Stipulations, Doc. No. 46, Ex.1. The Record is unclear where or how this packet came to be seized during the search.

glass smoking pipe with Lindsay and asked her whether the bowl of the pipe was too small to smoke Bayou Blaster; Lindsay responded "no." *Id.* at ¶ 37. During both of Stem's visits to Custom Blends, he purchased Bayou Blaster, which was sold in packages weighing 1.5 grams; in total, the officers purchased quantities of Bayou Blaster and Hayze Train Wreck, as well as two smoking pipes that were located near the locked cabinet containing the herbal incense.[9] *Id.* at ¶¶ 19, 30, & 37. The results of subsequent lab tests performed by DFS on the products purchased by Stem and the other undercover officers confirmed that none of the products contained any Section (A) substances. *See* Def.'s Stipulation, Doc. No. 70, Ex. 19.

Following these undercover purchases, on September 8, 2011, Stem submitted an affidavit and application to a Hanover County, Virginia, magistrate for a warrant to search the premises of Custom Blends. Aff. Search Warrant, Doc. No. 70, Ex. 27 [hereinafter "Warrant Aff."]; *see also* Doc. No. 48, Ex. 4 (Under Seal). Stem's affidavit, summarized in the unsealed Motion, stated that (1) the Store sold herbal incense products in quantities similar to those measured for marijuana (i.e., grams); (2) Lindsay told Stem and other undercover agents that although the Store could not carry/sell "spice" because it was illegal, it had other products available, which customers had told her were "good" and the same as spice; (3) although the incense was not sold for consumption purposes and Lindsay never directly told the defendant or any other undercover officer that they could smoke the product, she assisted with the selection of a glass tobacco pipe purchased at the same time as incense; and (4) while none of the lab tests from purchases

---

[9] Rogers points out that these products were locked because of their retail cost and that also locked in the same cabinet were other products, including a vaporizer, which are not claimed to be capable of any illegal use. Opp'n MSJ 4, ¶ 10.

made during the undercover visits to Custom Blends were positive for any Section (A) substances, Stem and other investigators "knew" that the purpose of such products was to emulate or simulate spice. MSJ 6-10, ¶¶ 19-20, 27, 30, 37.

Based on the information Stem provided in the search warrant application, the magistrate issued the search warrant on September 8, 2011. *Id.* at 11, ¶ 51. Later that same day, the HCSO conducted a search of Custom Blends. *Id.* at ¶ 52. During the search, officers spoke with both Rogers and Lindsay. Lindsay told the officers that, while working at Custom Blends, she sold herbal incense products at the rate of four to five times per day. *Id.* at 11-12, ¶ 53. Lindsay also "admitted to using" one of the products ("Atomic Angel"), but did not like how it made her feel.[10] *Id.* Rogers refused to admit that the Store sold spice, insisting that they sold "herbal incense" and that if a customer requests spice they are asked to leave. *Id.* at ¶ 54. Rogers stated that incense products the Store sold were marked "not for human consumption" but admitted that he could not control their use once the customer left the store. *Id.* Rogers also said, however, that if a customer requested the purchase of incense and also a pipe with which to smoke it, he would show the customer the Store's selection of pipes because "he is in the business to make money." *Id.* Finally, Rogers acknowledged that he was the manager, and he maintained records, including toxicology reports, in his desk at the Store. *Id.* at ¶ 79.

Following the search of Custom Blends, Stem discussed with his supervisor and members of the Hanover County Commonwealth Attorney's office what criminal charges would be brought against Rogers; and on September 14, 2011, Stem applied to a

---

[10] Stem understood Lindsay to say that she had "smoked" the product. Lindsay has denied under oath ever smoking through a pipe any of the herbal incense products, as opposed to being exposed to the smoke generated by the burning of an herbal incense. *See* Dep. Dawn F. Lindsay 117:6-118:18, Opp'n MSJ, Ex. 21.

magistrate for arrest warrants for Rogers. *Id.* at ¶¶ 60-80. In support of his application for the arrest warrants, Stem presented to the issuing magistrate Stem's sworn oral statements and also the affidavit he had prepared in support of the search warrant. *Id.* at ¶¶ 71 & 81. The magistrate issued the arrest warrants based on Stem's presentation; and on September 14, 2011, Rogers was arrested for conspiracy and possession with intent to distribute synthetic cannabinoids. *Id.* at ¶ 82.

Because none of the products sold at Custom Blends tested positive for any Section (A) substances, the charges against Rogers hinged on classifying the purchased herbal incense products as synthetic cannabinoids pursuant to Section (F). On February 17, 2012, the Hanover County General District Court dismissed the charges against Rogers at the preliminary hearing stage. Stip. Facts at ¶ 6. The plaintiff then filed his Complaint on August 30, 2012, alleging that Stem violated 42 U.S.C. § 1983 based on his arrest in violation of the Fourth and Fourteenth Amendments.[11]

### Standard of Review

Summary judgment is appropriate where the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The party seeking summary judgment has the initial burden to show the absence of material fact.

---

[11] On December 7, 2012, the Court issued an Order denying the defendant's Motion to Dismiss the Complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Doc. No. 10.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").

Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party, that is, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007). However, "unsubstantiated, conclusory claims without evidentiary support are insufficient to satisfy a non-moving party's burden on summary judgment." *Carter v. Ball*, 33 F.3d 450, 461-62 (4th Cir. 1994).

### Analysis

To prevail on his § 1983 claim, Rogers must establish that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfgrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). Rogers claims that while acting under color of state law, Stem violated his constitutional rights when he (Stem) obtained the warrants for

10

Rogers' arrest: (1) without probable cause, and (2) based on untruthful testimony to the

issuing state court magistrate. Stem does not dispute that he was acting under color of

state law, but does claim that as a matter of law he had probable cause to obtain the

warrants issued for Rogers' arrest. Stem further contends that even if he did not have

probable cause, his conduct is protected under the doctrine of qualified immunity.

To determine if qualified immunity protects an officer from liability for a federal

constitutional violation, the Court must consider: (1) whether the facts, when taken in a

light most favorable to the injured party, show that the officer's conduct violated a

constitutional right; and if so, (2) whether the right asserted was "clearly established" at

the time. *Miller v. Prince George's Cnty.*, 475 F.3d 621, 626-27 (4th Cir. 2007); *see also*

*Saucier v. Katz*, 533 U.S. 194, 201 (2001). Whether a "clearly established" right has

been violated is to be determined within the specific context of the case and depends on

"[whether] it was clear to a reasonable officer that the conduct in which he allegedly

engaged was unlawful in the situation he confronted." *Merchant v. Bauer*, 677 F.3d 656,

662 (4th Cir. 2012) (quoting *Figg v. Schroeder*, 312 F. 3d 625, 635 (4th Cir. 2002)).

However, "qualified immunity does *not* protect an officer who seeks a warrant on the

basis of an affidavit that a reasonably well-trained officer would have known failed to

demonstrate probable cause—even if the magistrate erroneously issues the warrant."

*Miller,* 475 F.3d at 632 (citing *Malley v. Briggs,* 475 U.S. 335, 345 (1986)). Here, Rogers

claims the well-established constitutional right to be free from unreasonable seizure, i.e.,

arrest without probable cause.[12] *See Bauer,* 677 F.3d at 656 ("Unquestionably, '[t]he

___

[12] The specific elements of Rogers' constitutional claim are that Stem caused his seizure, without probable cause, and that the criminal proceedings against Rogers were terminated in the plaintiff's favor. *See Durham v. Horner,* 690 F.3d 183, 188 (4th Cir. 2012). Stem

Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable.'"). Stem does not dispute that such a constitutional right exists, but rather claims that he did not violate such a right because he had probable cause to obtain warrants for Rogers arrest or, if he did not have probable cause, as he claims, Rogers' arrest, under the specific circumstances of this case, did not constitute a violation of a "clearly established" constitutional right.

### 1.  Whether Stem Had Probable Cause to Seek Arrest Warrants for the Plaintiff

In order to assess whether Stem had probable cause to obtain the arrest warrants for Rogers, the Court must examine the totality of the circumstances known to Stem at the time he applied for Rogers' arrest warrants. *See United States v. Al-Talib*, 55 F.3d 923, 931 (4th Cir. 1995) (assessing whether probable cause existed requires "courts [to] look to the totality of the circumstances known to the officers at the time of the arrest." (quoting *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983))). Probable cause exists when there is enough evidence "to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949); *see also United States v. Garcia*, 848 F.2d 58, 59-60 (1988) (holding that probable cause exists when facts and circumstances known to the officer "would warrant the belief of a prudent person that the arrestee had committed or was committing an offense."). This type of assessment must be made within the context of the specific offense under consideration, which requires this Court to consider centrally the elements of the crimes charged.

---

does not contest that he caused Rogers' arrest or that the criminal proceedings terminated in the plaintiff's favor.

There is no dispute that Rogers' arrest was based on Stem's belief that Custom Blends sold herbal incense products that qualified as synthetic cannabinoids under Section (F). In order to be a synthetic cannabinoid under Section (F), an unlisted "drug" must not only be "privately compounded . . . to emulate or simulate the effects of synthetic cannabinoids", but must also be compounded "with the specific intent to circumvent the criminal penalties for synthetic cannabinoids." Va. Code §18.2-248.1:1(F)(2011). In addition, the intended effects must be obtained "through chemical changes such as the addition, subtraction or rearranging of a radical or the addition, subtraction, or rearranging of substituent. . . ." *Id.*

The Court concludes that there is no reasonable reading of Section (F) that would have allowed Stem, or any reasonable law enforcement officer, to think, based on the information known to him, that he had probable cause to believe that all the requirements of Section (F) had been met, such that Rogers had committed the offenses for which he was arrested. Here, Stem concluded he had probable cause to obtain Rogers' arrest warrant largely based on (1) DFS's laboratory results of his June 9, 2011, purchase of Bayou Blaster, which showed that this product contained a detectable amount of 1-(5-Fluoropentyl)-3-(1-naphthoyl)indole ("AM2201") [*see* Joint Stipulations, Doc. No. 46, Ex. 2; MSJ 7, ¶¶ 25-28]; and (2) his and Inv. B's knowledge "based on their training and experience" that although AM2201 was not at the time "listed" under Section (A), the only reason this substance would be in Bayou Blaster was "to emulate or simulate the effects of synthetic cannabinoids." *Id.* at ¶ 27.[13] This information, however, fails to

---

[13] Stem also points to the 2012 amendments to Va. Code §18.2-248:1-1, passed after Rogers' arrest, as further evidence that he reasonably believed Bayou Blaster to be a Section (F) cannabinoid. Those amendments added AM2201, as well as other

establish probable cause to believe that Bayou Blaster was a synthetic cannabinoid under Section (F).

First, Stem lacked any information as to who had "privately compounded" the AM2201 or when this occurred. Stem never claimed or suggested that Rogers, Lindsay, or anyone else employed by Custom Blends had compounded anything found in Bayou Blaster, which the Store received in sealed packages from its commercial distributor; and there is nothing to suggest that Stem knew, or made any effort to determine, who, if anyone, had "privately compounded" the AM2201 found in Bayou Blaster. Stem knew, or had available, the name of Custom Blends' distributor, but there is nothing in the record that suggests any investigation into the wholesaler or that anything was known about that wholesaler, including whether it, one of its own suppliers, or someone even earlier in the commercial distribution chain, had privately compounded the AM2201 found in Bayou Blaster and/or made chemical changes to the product.

Given Stem's lack of any information concerning who privately compounded the AM2201 or manufactured Bayou Blaster, it is not surprising that he also lacked any particularized information concerning the other requirements of Section (F), including, most glaringly, the *mens rea*, or specific intent, of the person who compounded the AM2201 found in Bayou Blaster. For example, Stem had no information pertaining to: (1) when, where, or under what conditions the AM2201 was compounded; (2) when, where, or under what conditions the Bayou Blaster was packaged; (3) the state of the law where the compounder or packager was located (or in Virginia, for that matter) at the

compounds, to Section (A). Such a Section (A) designation, however, only highlights the need to establish that the AM2201 found in Bayou Blaster before the amendments satisfies, among other elements, the specific intent requirement of Section (F); and the need to assess probable cause within the context of Section (F).

time AM2201 was compounded and applied or added to other ingredients in Bayou

Blaster; or (4) what knowledge the compounder or packager had of those laws at the time

AM2201 was compounded and applied or added to Bayou Blaster. Stem understood that

synthetic cannabinoids gained currency beginning in 2010,[14] but there is nothing in the

record to suggest that Stem knew or considered whether Bayou Blaster's marketing as an

herbal incense predated or post-dated the use of synthetic cannabinoids to mimic

marijuana intoxication. There is also nothing in the record that establishes or suggests

what Stem knew about how Bayou Blaster was marketed or the extent to which it was, in

fact, used by consumers as herbal incense, to be burned as an aromatic, rather than

smoked as a marijuana substitute.

Based on this record, it would appear that Stem, and apparently the other persons

who reviewed the facts and the law with Stem, proceeded on nothing more than general

speculative inferences with respect to a central requirement of Section (F)—the specific

intent of the compounder. They simply assumed that any product with a compound

capable of mimicking marijuana had to have been compounded "with the intent to

circumvent the criminal penalties for synthetic cannabinoids." Such a broad reading of

Section (F) would enormously expand its scope and effectively eliminate the

individualized assessment of probable cause required by the specific intent element of

Section (F). Stem's interpretation also eliminates the need to obtain proof as to Section

(F)'s most challenging aspects – the identity of who compounded the drug that mimicked

the effect of marijuana and the intent of the compounder at the time. Here, Stem had no

---

[14] Hanover County law enforcement officials claim they became "acutely" aware of the
dangers associated with the ingestion of synthetic cannabinoids after a juvenile
"overdosed" (but survived) on spice in March 2011. MSJ 4, ¶ 2.

information that would let him even begin that assessment, and it appears that he, in fact, made no such particularized inquiry. Stem declares *ex cathedra* that "[t]hose forms of 'Spice' in the shipment [that was seized from Custom Blends on April 13, 2011] that were not listed specifically in subsection A had been compounded to circumvent the criminal penalties for synthetic cannabinoids, to emulate the effects of synthetic cannabinoids." Rebuttal Mem. Supp. MSJ 4, Doc. No. 74 [hereinafter "Def.'s Rebuttal"]. But the record does not contain facts sufficient to support what amounts to an *ipse dixit* with respect to the specific intent of the actual compounder of the AM2201 found in the purchased packages of Bayou Blaster. Stem simply assumed that any product containing AM2201 was compounded with the required specific criminal intent, no matter where, when, or under what circumstances.

The specific intent requirement in Section (F) is clearly intended to limit its reach by excluding from its scope products that have and were created and sold for legitimate, lawful uses, but which could mimic the effects of a Section (A) listed synthetic cannabinoid through product misuse. In short, the specific intent requirement in Section (F) prevents law enforcement from doing precisely what it did in this case: prosecute someone solely because an otherwise legal product, with legitimate uses other than as a marijuana substitute, could be used by a consumer to mimic the effects of a synthetic cannabinoid, or that such a product could be "confused" with a banned substance. Stem's belief that he had probable cause was predicated upon a reading of Section (F) that effectively eliminated the narrowing elements of that section, presumably in the name of more effective law enforcement.

Stem's legal misreading of Section (F) and the truncated probable cause assessment that it spawned, undercut the significance of the reviews and other procedural steps that Stem pursued within the Sheriff's office and the Commonwealth Attorney's office before he applied for the arrest warrants, as well as the issuing magistrate's own presumed determination of probable cause. It is true that in evaluating whether an objectively reasonable officer could have believed that probable cause existed to arrest Rogers, a reviewing court should consider those efforts, the advice received, and the magistrate's confirming issuance of the warrants. *See Torchinsky v. Siwinski*, 942 F.2d 257, 263 (4th Cir. 1991) ("a reasonable officer . . . could view these consultations . . . as additional confirmation that probable cause was present."); *see also Wadkins v. Arnold*, 214 F.3d 535 (4th Cir. 2000) (a prosecutor's approval of criminal charges can "and should appropriately be taken into account in assessing the reasonableness of [the law enforcement officer's] actions."); *Bauer*, 677 F.3d at 664-665 (summarizing and discussing *Torchinsky* and *Wadkins*). But in assessing the extent to which these kinds of consultations and approvals should weigh in favor of finding probable cause, a court must distinguish those situations where a warrant was issued based on an officer's mistake of fact from those where the warrant was issued based on a mistake of law. *See Bauer*, 677 F.3d at 664. Where, as here, the officer's determination of probable cause was based on a "patently deficient" legal understanding of what conduct is prohibited under the applicable statute, the approval of his supervisors and the Commonwealth Attorney "does not—as a matter of law—overcome the unreasonableness of the criminal charge and its lack of probable cause." *Id.*

17

With respect to the magistrate's issuance of the warrants, the Fourth Circuit's analysis in *Bauer* applies here: "[just because] a magistrate issued an arrest warrant at [the officer's] request is not determinative 'where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable.'" *Bauer*, 677 F.3d at 665 (citing *Torchinsky*, 942 F.2d at 261). That proposition applies with particular force in this case where the information that Stem provided to the issuing magistrate was necessarily misleading and the magistrate could easily have misunderstood the scope of the factual representations that Stem was making. For example, the affidavit filed in support of the search warrant, which Stem again used in connection with his application for the arrest warrants, defined "Spice" as a "Synthetic Marijuana."[15] *Id.* at 1 ¶ 3. He then repeatedly used the term spice in his application to refer to items he had purchased at Custom Blends, even though none of the purchased products contained any Section (A) substances. *See* Warrant Aff. 1-2 & "Attachment 1"; *see also* Opp'n MSJ 17-19, ¶¶ 52-57; MSJ 21 ("The significant facts obtained during the execution of the Search Warrant included confirmation that Custom Blends was still

---

[15] Stem answered Section 3 of the Affidavit, "[t]he things or persons to be searched for" as follows: "Synthetic Marijuana known as 'Spice,' (and/or any name associated with Spice). . . ." Warrant Aff.; *see also* Dep. of Christopher Stem (Feb. 27, 2013) 176:21-177:2, Doc. No. 70, Ex. 9 ("Q. When you say Spice, do you mean the brand Spice? A. It's a street name for synthetic marijuana, synthetic cannabinoids."). Stem's Affidavit ends with the following summary statement:

> Your affiant [Stem] knows all types of "Spice" or any compound sold as "Spice," such as those purchased during the three controlled buys, which are chemically altered to have the same affects [sic] as "Spice" when smoked are illegal in the Commonwealth of Virginia. Your affiant knows from previous "Spice" cases that stores that sell products related to "Spice" keep records/documents pertaining to the sale of "Spice", "Spice" products, and other illegal contraband in the business.

actively selling Spice to customers . . . .") & 4-13, ¶¶ 6, 19, 30, 37, 53-54. The magistrate would have likely understood Stem to be saying under oath that he had personal knowledge of facts sufficient to believe that the purchased Bayou Blaster satisfied all the requirements for a synthetic cannabinoid under Virginia law. That implied representation was, at best, inherently misleading. Based on Stem's presentation under oath to the magistrate, as Stem has described it, and based on the contents of his affidavit in support of the warrants, the magistrate could have reasonably believed that Stem had evidence he simply did not have; and there is nothing in Stem's presentation that would have placed the magistrate on notice that he (Stem) had no evidence of the required specific intent particular to the source of the AM2201 found in Bayou Blaster, which was in fact unknown to Stem. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (holding probable cause must be "particularized with respect to that person."). In the face of Stem's statements under oath that he had repeatedly purchased spice, which he defined as "Synthetic Marijuana," Stem's statement that Bayou Blaster had not tested positive for any Section (A) substances hardly informed the magistrate that he had no evidence that did satisfy the requirements of Section (F).

In summary, based on the information available to Stem at the time he obtained the warrants for Rogers' arrest, no reasonable law enforcement officer could think that he had the required, particularized probable cause to believe that Rogers was subject to criminal liability under Section (F). Rather, it appears from this record that Stem, as well as others involved in discussions leading up to the decision to obtain the arrest warrants for Rogers, simply assessed probable cause based on a conjured up statute that made it illegal to possess any product that could mimic or be confused with a synthetic

cannabinoid listed in Section (A). In the end, Stem simply assumed the answers to the

critical and difficult issues posed under Section (F). Stem's legal interpretation cannot be

reconciled with the actual requirements under Section (F). Stem therefore violated

Rogers' well established rights under the Fourth Amendment when he applied for and

obtained the issued warrants for Rogers' arrest without probable cause.[16]

### 2. Whether Stem is Entitled to Qualified Immunity as a Matter of Law

Having determined that Stem violated Rogers' Fourth Amendment rights, the

Court must now consider whether that violated constitutional right was "clearly

established" in the specific context of this case; that is, whether it should have been clear

to a reasonable officer in Stem's position that his conduct was unlawful in the situation

he confronted.

Stem argues that an objectively reasonable officer could have believed that

probable cause existed to arrest Rogers. He points to the fact that the Ban on Synthetics,

and Section (F) in particular, was a newly enacted law, never construed by any court, as

far as he knew, and that in those circumstances the legal interpretation of that law by the

Commonwealth Attorney and his own reviewing supervisors would have caused a

reasonable officer to proceed as he did. Def.'s Rebuttal 12-14. The difficulty with this

position is that the interpretation of Section (F) that Stem used to conclude he had

probable cause is so at odds with the plain language of Section (F) pertaining to the

specific intent requirement that no reasonable, prudent officer would (or should) have

---

[16] Because of the Court's decision as to the lack of probable cause with respect to
requirements of Section (F), the Court need not decide whether Stem had probable cause
with respect to the other elements of the crimes for which he was arrested, including
conspiracy, and Rogers' intent to distribute a product that constituted a synthetic
cannabinoid under Section (F).

adopted it.[17] Whatever may be open to interpretation under Section (F), a reasonable police officer in Stem's position did not need a judicial interpretation of the statute to know that Section (F) requires particularized evidence of the compounder's specific intent. A reasonable police officer in Stem's position would have known that he did not have any such evidence of that intent; and no reasonable police officer in Stem's position could have believed that the Fourth Amendment permitted an arrest where there was no evidence pertaining to that critical aspect of Section (F). *See Bauer*, 677 F.3d at 666 ("No reasonable police officer in Bauer's position could have believed that the Fourth Amendment permitted an arrest when no aspect of the [applicable statute] had been established.").

To avoid the application of qualified immunity with respect to Stem's obtaining the arrest warrants, it must be shown that Stem "deliberately or with a 'reckless disregard for the truth' made material false statements in his affidavit, or omitted from that affidavit 'material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading." *Miller*, 475 F.3d at 627 (citations omitted). For the reasons stated above, when the facts are viewed most favorably to Rogers, a jury could reasonably conclude that Stem did in fact omit from his affidavit "material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading." *Id.* Examples of some of the omitted facts, which negate probable cause, include: that he had no information concerning who actually compounded the AM2201;

---

[17] The record does not disclose what was specifically told to the Commonwealth Attorney's office in connection with its consideration of whether to bring charges against Rogers, but for the reasons previously discussed, neither the Commonwealth Attorney or his supervisors could eliminate the specific intent requirement of Section (F) or permit Stem to obtain a warrant without any evidence of the compounder's specific intent.

when, where, or under what circumstances it was compounded; when, where, or under what circumstances it was added to Bayou Blaster; or the specific intent of any compounder at the time of compounding. *See id.*, at 628 ("To determine materiality, a court must 'excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause.'"). Rather, Stem told the magistrate that he had, in fact, purchased Spice, which he defined as a synthetic cannabinoid,[18] when, in fact, he did not have the information necessary to reasonably believe that what he had purchased was an illegal synthetic cannabinoid, as then defined under Virginia law. Under these circumstances, a reasonable, prudent officer in Stem's position "must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Miller*, 475 F.3d at 627. For the above reasons, the Court concludes that Stem is not entitled to summary judgment as to his defense of qualified immunity.

### Conclusion

For the above reasons, defendant Stem's Motion for Summary Judgment [Doc. No. 47] is DENIED. The Court will issue an appropriate Order.

The Clerk is directed to forward copies of this Opinion to all counsel of record.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
July 2, 2013

---

[18] *See supra* note 15.